IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATHEW HARRISON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WAYNE PERRY, DYNOVA LABORATIES, INC., SICAP INDUSTRIES, LLC, HI-TECH PHARMACAL, INC., and WALGREEN CO.,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Mathew Harrison ("Plaintiff"), through his attorneys, brings this action on behalf of himself and all others similarly situated. Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF ACTION

1.      This is a class action against Wayne Perry ("Perry"), SiCap Industries, LLC ("SiCap Industries," collectively with Perry, "SiCap"), Dynova Laboratories, Inc. ("Dynova Laboratories," collectively with SiCap, "Dynova"), Hi-Tech Pharmacal, Inc. ("Hi-Tech," collectively with Dynova, "Hi-Tech"), and Walgreen Co. ("Walgreen," collectively with Hi-Tech, "Defendants") arising out of the sale of Sinus Buster/Buster Brands Products (the "Sinus Buster Products"). [1]

---

[1] The Sinus Buster Products include: Sinus Buster, Sinus Buster Mild, Cold Buster f/k/a Sinus Buster Anti-Cold Formula, Allergy Buster f/k/a Sinus Buster Allergy Formula, and Headache Buster f/k/a Sinus Buster Headache Formula.

2.     The Sinus Buster Products are a line of capsaicin-based drugs that are marketed and sold online and in retail stores across the country to treat sinus congestion and related cold and allergy and headache symptoms. Sinus Buster Products sell for $10.00 to $15.00 per bottle.

3.     Capsaicin is the ingredient in spicy cayenne peppers that makes them hot. Defendants claim this ingredient has the remarkable ability to treat sinus congestion and related cold and allergy and headache symptoms. However, Sinus Buster Products are ineffective for this purpose, and they are worthless.

4.     Defendants market and sell the Sinus Buster Products as over-the-counter ("OTC") homeopathic drugs.

5.     The U.S. Food and Drug Administration ("FDA") has repeatedly stated that it is not aware of any scientific evidence to support the efficacy of any homeopathic products for any condition. Nevertheless, unlike non-homeopathic OTC drug products, the FDA does not evaluate or approve homeopathic drugs before they can be marketed or sold. In recent years, unscrupulous hucksters have avoided FDA oversight merely by marketing their products as homeopathic.

6.     Sinus Buster Products are not homeopathic. They are illegal unapproved non-homeopathic drugs. Sinus Buster Products are marketed and sold by Defendants as homeopathic to avoid substantiation requirements for safety and efficacy of non-homeopathic OTC drugs.

7.     The FDA has explicitly stated that the Sinus Buster Products have "not been evaluated by the Food and Drug Administrations for safety and efficacy." Defendants, however, have misled consumers into believing that the Sinus Buster Products are FDA approved.

2

8.      Plaintiff seeks relief in this action individually, and on behalf of a class defined

as all persons who, within the relevant statute of limitations period, purchased Sinus Buster

Products in the United States (the "Class"), and on behalf of a subclass defined as all Class

members who purchased Sinus Buster Products in the State of Minnesota (the "Minnesota

Subclass"), for Defendants' violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301,

*et. seq.*, for unjust enrichment, common law fraud, breach of express warranty, breach of

implied warranties of fitness and merchantability, violations of Minn. Stat. § 8.31, *et seq.* and

the consumer fraud statutes of the fifty states.

### THE PARTIES

9.      Plaintiff Mathew Harrison ("Harrison") is a citizen of Minnesota.  On or about

March 6, 2010, Plaintiff Harrison purchased purportedly homeopathic Sinus Buster for his

personal use from a Walgreen retail pharmacy located in Rogers, Minnesota.  He paid $13.00 for

one Sinus Buster nasal spray, which is twice the price of other brand-name nasal sprays he has

purchased.  Prior to purchasing Sinus Buster, Plaintiff heard a radio advertisement about the

product while listening to a sports-talk program on KFAN, and he also read the product claims

on the packaging.  Plaintiff purchased Sinus Buster in reliance on the claims he heard and read,

including that Sinus Buster was an "all natural" "non habit forming formula," "clinically proven"

to provide "fast relief" for "sinus congestion" and "nasal congestion."  However, Sinus Buster is

not effective to provide any relief for sinus or nasal congestion, and the advertising claims about

its purported benefits are unsubstantiated.  Plaintiff would not have purchased Sinus Buster if he

had known that the advertising claims were false.  Instead, Plaintiff would have purchased a

different, less expensive nasal spray—which he ultimately did because of Sinus Buster's failure

3

to relieve his congestion. Plaintiff used Sinus Buster nasal spray but did not experience any of the advertised benefits.

10. Defendant Perry is an individual residing in Schenectady, New York. Perry is the creator and developer of the Sinus Buster Products, and was the founder and CEO of Defendant SiCap Industries until 2010. Perry also served as spokesperson for the Sinus Buster Products and retains a financial interest in the continued sales of those products.

11. Defendant Hi-Tech is a Delaware corporation with its principal place of business located in Amityville, New York. Hi-Tech is a specialty pharmaceutical company developing, manufacturing and marketing generic and branded prescription and OTC products. In 2012, Hi-Tech acquired the Sinus Buster Products, which it continues to market and sell through its Health Care Products division.

12. Defendant SiCap Industries is a limited liability company with its principal headquarters located in Schenectady, New York. SiCap Industries was founded by Perry in 2003. Since 2008, SiCap Industries has been a wholly owned subsidiary of Dynova Laboratories. SiCap Industries engaged in the design and marketing of purportedly homeopathic herbal based nutritional products.

13. Defendant Dynova Laboratories is a privately held corporation organized under the laws of the State of Delaware, with its corporate headquarters located at 36 Cattano Avenue, Suite 300, Morristown, New Jersey 07960. Dynova develops and markets natural healthcare products and supplements. In 2008, Dynova acquired SiCap Industries and its line of Sinus Buster Products.

14. Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois. At all relevant times hereto, Walgreen affirmatively participated

4

in and/or adopted the false and misleading advertising and marketing claims about the Sinus Buster Products set forth below.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A).  This controversy, exclusive of interest and costs, exceeds $5,000,000.00; there are more than 100 Class members; and the named Plaintiff, as well as most members of the proposed Class and Minnesota Subclass, are citizens of states different from the state of Defendants.

17.     The Court has personal jurisdiction over Defendants in that (i) SiCap Industries is a citizen of New York and maintains its principal headquarters in New York; (ii) Hi-Tech is citizen of New York and maintains its principal headquarters in New York; (iii) Perry is a citizen and resident of New York; (iv) Dynova Laboratories has conducted substantial business in New York; (v) Walgreen is registered to do business in New York and conducts substantial business in New York; and (vi) Defendants' false and misleading statements at issue emanated from New York.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(c) because Hi-Tech's principal place of business is located in Amityville, New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### *The Regulation of Non-Homeopathic Versus Homeopathic OTC Drugs*

19.     Non-homeopathic OTC drugs are subject to stringent evaluation and testing requirements to determine whether such drugs are safe, effective and not misbranded using a drug monograph system created by the FDA. *See* 21 C.F.R. §§ 330.1, 330.10.

20.     The FDA defines homeopathy as "the practice of treating the syndromes and conditions which constitute disease with remedies that have produced similar syndromes and conditions in healthy subjects." *See* 21 U.S.C. § 321(g)(1)(A). Inspections, Compliance, Enforcement, and Criminal Investigations, Compliance Policy Guides § 400.400, "Conditions Under Which Homeopathic Drugs May be Marketed" ("CPG § 400.400").

21.     The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* defines a "drug" to include articles that are recognized in the Homeopathic Pharmacopoeia of the United States and its supplements (the "HPUS") and includes both prescription and OTC drugs. 21 U.S.C. § 321(g)(1). The HPUS is "[a] compilation of standards for source, composition, and preparation of homeopathic drugs [, which] contains monographs of drug ingredients used in homeopathic treatment." CPG §400.400. Although the HPUS describes how these ingredients are prepared for homeopathic use, it does not list the drugs as fit to treat specific symptoms, ailments, or conditions. Instead, the HPUS allows the practitioner or manufacturer to set forth the substance's indications for use.

22.     The FDA notes that "a product's compliance with requirements of the HPUS … does not establish that it has been shown by appropriate means to be safe, effective, and not misbranded for its intended use." CPG § 400.400.

6

23.     Homeopathic OTC drugs are treated as a subset of OTC drugs by the FDCA and its various regulations and are not subject to the same evaluation, testing and substantiation requirements that the FDA applies to traditional non-homeopathic OTC drugs. According to one division of the FDA, "[b]ecause homeopathic products are supposed to contain little or no active ingredients, they do not have to undergo the same safety and efficacy testing as prescription and new OTC drugs."

24.     Unlike non-homeopathic OTC drugs, homeopathic OTC drugs are not evaluated by the FDA at all. Indeed, the FDA has "acknowledge[d] that many homeopathic drug products are manufactured and distributed without FDA approval or authorization under [its] enforcement policies."

25.     Moreover, the FDA does not impose standards for strength, purity, quality, safety, or efficacy on homeopathic OTC remedies in addition to those prescribed in the HPUS. The FDA will not enforce the requirements of CFR Sec. 211.165 requiring laboratory determination of the identity and strength of their active ingredients prior to release as they relate to homeopathic OTC drug products. CPG § 400.400.

26.     The FDA merely requires that the labels on OTC homeopathic remedies include at least one major indication of use, a list of ingredients, the dilution, and safety instructions. The FDA does not require homeopathic product labels to make any claims concerning the effectiveness of those products, nor are homeopathic product labels approved by the FDA.

27.     Thus, rather than the stringent testing and evaluation applied to other OTC drugs, homeopathic drug substances are included in the HPUS after having been subjected to certain "provings," which were originally conducted in the 1800's and early 1900's to establish what types of symptoms resulted from the use of a homeopathic substance in a healthy person.

28.     The FDCA prohibits the sale of misbranded drugs, whether they are conventional or homeopathic. *See* generally 21 U.S.C. § 331. Under the FDCA, a drug will be deemed to be misbranded if the label is false or misleading. 21 U.S.C. § 352(a).

29.     Manufacturers of homeopathic products, however, do list their product labels with the FDA. The FDA and the NIH maintain an Online Label Repository at which OTC manufacturers submit their product labels for listing. The FDA clearly indicates that the mere listing of a homeopathic product should not be misinterpreted or misrepresented to suggest that the FDA has approved or even evaluated the safety and efficacy of that product. The repository website reads: "Drugs marked ... "unapproved homeopathic" ... on this Web site have not been evaluated by FDA for safety and efficacy and their labeling has not been approved. In addition, FDA is not aware of scientific evidence to support homeopathy as effective."

30.     Moreover, the database entries for each homeopathic OTC drug in the repository read: "Unapproved Homeopathic" and they each bear the following disclaimer in bold, capitalized, multicolored type:

**NOTE:   THIS   HOMEOPATHIC   PRODUCT   HAS   NOT BEEN EVALUATED BY THE FOOD AND DRUG ADMINISTRATION FOR SAFETY OR EFFICACY. FDA IS NOT AWARE OF SCIENTIFIC EVIDENCE TO SUPPORT HOMEOPATHY AS EFFECTIVE.**

### The History Of The Sinus Buster Products

*Defendant Wayne Perry And The Original Non Homeopathic Sinus Buster*

31.     Perry is an entrepreneur and the inventor of and former spokesperson for Sinus Buster Products.

32.     Perry has no training in either conventional or homeopathic medicine.

8

33. Perry founded SiCap Industries in 2003,[2] which he claims stands for "the Science of Capsaicin."

34. In September 2003, Perry began manufacturing his first Sinus Buster product, as the world's first all-natural hot pepper nasal spray through SiCap Industries. The original product packaging and advertising for Sinus Buster made claims that the product could instantly relieve sinus headaches, colds, congestion, migraine headaches and allergy symptoms, among other things. However, all of these claims were false.

35. To lawfully sell non homeopathic drugs for the treatment, cure or prevention of sinus, cold, headache and allergy symptoms, the manufacturers must provide substantial evidence of their safety and efficacy to the satisfaction of the FDA through its new drug application ("NDA") process.

36. Sinus Buster Products have never received approval through the FDA's NDA process to be sold as over-the-counter drugs. Therefore, SiCap began marketing Sinus Buster Products as homeopathic remedies in order to continue making their treatment claims while avoiding the FDA's stringent regulatory hurdles.

### Sinus Buster Products Get Rebranded As Homeopathic Remedies

37. In 2006, SiCap began marketing Sinus Buster as a homeopathic remedy in regular, mild and maximum dosages. The labels on the "new homeopathic" Sinus Buster also separated inactive ingredients from active ingredients. The active ingredients were listed by their purported homeopathic strengths: "capsaicin (3x)" and "eucalyptus (TINC)."

38. At the same time, SiCap released the full line of purportedly homeopathic Sinus Buster Products, corresponding to an earlier line of non-homeopathic Sinus Buster Products,

---

[2] Perry also served as SiCap's CEO until at least 2010.

9

including Sinus Buster: Anti-Cold Formula, Sinus Buster: Allergy Formula, and Sinus Buster:

Headache Formula. Each of the Sinus Buster Products listed a homeopathic concentration of

capsaicin as an active ingredient.

### *Homeopathic Sinus Buster Products*

39.     The only difference between the old non-homeopathic Sinus Buster Products and

new non-homeopathic versions was the labels.  All of the new "homeopathic" Sinus Buster

Products included the same ingredients as their old non-homeopathic counterparts. Only now,

those ingredients were described according to their purported homeopathic strengths and SiCap

claimed they work "homeopathically," rather than by principles of conventional science and

medicine.

40.     Moreover, while SiCap had claimed that every ingredient in the original Sinus

Buster product served a particular function, many of those same ingredients were listed as

inactive ingredients in the new "homeopathic" Sinus Buster Products.

### *Dynova's Acquisition Of SiCap Industries And The Rebranding Of The Sinus Buster Products*

41.     In approximately July 2008, SiCap Industries was acquired by Dynova

Laboratories. Dynova represents on its website that "Dynova Laboratories has the marketing

muscle and consumer insight, along with the clinical expertise and financial resources necessary

to [promote SiCap's products]."

42.     Following the acquisition, Dynova rebranded the Sinus Buster: Anti-cold

Formula, Sinus Buster: Allergy Formula and Sinus Buster: Headache Formulas and continued

to sell the Sinus Buster Products as Buster Brands® products. Dynova sold Sinus Buster, Sinus

Buster Mild, Cold Buster (f/k/a Sinus Buster Anti-Cold Formula), Allergy Buster (f/k/a Sinus

Buster Allergy Formula), and Headache Buster (f/k/a Sinus Buster Headache Formula).

**The Buster Brands Makeover**

43.     Dynova's new packaging and website made similar or identical representations about each of the Sinus Buster Products prior to the acquisition.   The Sinus Buster Products continued to be marketed together on the www.BusterBrands.com website in  a common marketing campaign which promises consumers that each of the Sinus Buster Products are "fast, effective and safe."

44.     Each of the Sinus Buster Products are described as follows on their respective BusterBrands.com webpages and product packaging:

      *a.*     *Sinus Buster*

45.     The Buster Brands webpage for Sinus Buster reads:

- "Fast: begins to provide relief in under a minute;"

- Effective: A powerful congestion clearing sensation proven effective and praised by serious sufferers;"

- "Safe: enjoy worry free relief- as long as you need it.  Non-habit forming; free of harmful side effects; no known drug interactions. ... (Compare with three-day use warning on synthetic chemically based sinus sprays);" and

- "Relief from nasal congestion; sinus pressure; sinus headache;"

46.     Moreover, the Sinus Buster webpage is linked to another webpage devoted to the purported clinically proven benefits of Sinus Buster (the "Proven Relief Page").

11



47.　　The packaging for Sinus Buster promises:  fast relief for sinus congestion, nasal congestion sinus pressure and headaches.

48.　　The front of the packaging reads:  "CLINICALLY PROVEN."

49.　　A side panel reads: "the proprietary Sinus Buster formula is the only all natural nasal spray that has been clinically shown to start working in under 1 minute."

50.　　The same panel also reads "CLINICALLY TESTED SAFETY."

51.　　The Sinus Buster packaging claims that the product is homeopathic, listing Capsaicin annum 3(x) as the product's only active ingredient and a number of inactive ingredients including eucalyptol.

52.　　In a second variation of the product's ingredient list, the Sinus Buster webpage lists undiluted eucalyptol in the same product as an active, not an inactive ingredient.

12

       *b.*    *Sinus Buster Mild*

53.    The Buster Brands webpage for Sinus Buster Mild reads:

- "Fast: begins to provide relief in under a minute;"

- Effective: A powerful congestion clearing sensation proven effective and praised by serious sufferers," with a link to the Proven Relief Page;

- "Safe: enjoy worry free relief- as long as you need it. Non-habit forming; free of harmful side effects; no known drug interactions. . . .(Compare with three-day use warning on synthetic chemically based sinus sprays);" and

- "Relief from nasal congestion; sinus pressure; sinus headache."

54.    The packaging for Sinus Buster Mild promises: fast relief for nasal congestion, sinus pressure and headaches.

55.    The Sinus Buster Mild packaging claims that Sinus Buster Mild is homeopathic, lists Capsicum annum 5(x) as the product's only active ingredient, and lists a number of inactive ingredients including eucolyptol.

56.    In a second variation of the product's ingredient list, the Sinus Buster Mild website lists undiluted eucalyptol as an active, not an inactive ingredient in the same product.

       *c.*    *Allergy Buster*

57.    The Buster Brands webpage for Allergy Buster reads:

- "Fast: begins to provide relief in under a minute;"

- "Effective: a powerful congestion-clearing sensation proven effective and praised by serious sufferers," with a link to the Proven Relief Page;

- "Safe: enjoy worry free relief- as long as you need it. Non-habit forming; free of harmful side effects; no known drug interactions. ... (Compare with three-day use warning on synthetic chemically based sinus sprays);" and

- "Quickly relieves nasal congestion; sneezing; sinus pressure and headache."

58.     The packaging for Allergy Buster promises fast relief from runny nose, sneezing sinus congestion, sinus pressure and headache.

59.     The product packaging lists the active ingredients in Allergy Buster as Capsicum annum 5x (capsaicin), Eucalyptus globulus 2x (eucalyptol), Urtica dioica 3x (nettle).

60.     In a second variation of the Allergy Buster ingredient list, the label submitted by Dynova to the FDA lists Eucaluptol as an inactive, rather than an active ingredient

61.     In a third variation of the product's ingredient list, however, the Buster Brands website claims that Allergy Buster has a *ten times greater* concentration of Capsicum annum (4x), a *one hundred times greater* concentration of eucalyptol and a *one thousand time greater concentration* of nettle than is indicated on the product packaging.

        *d.*    *Cold Buster*

62.     The Buster Brands webpage for Cold Buster reads:

- "Safe: enjoy worry free relief- as long as you need it.  Non-habit forming; free of harmful side effects;"

- "Effective: attacks the cause of illness; speeds the movement of mucus out of the respiratory tract; boosts the immune system. Unlike many cold remedies that simply mask symptoms, Cold Buster speeds recovery. The active ingredient in Cold Buster has been clinically shown to significantly reduce duration and severity of cold symptoms;" and

- "Provides relief from congestion, sneezing, cough and sore throat."

63.     The front panel packaging for Cold Buster reads, in part: "HOMEOPATHIC," REDUCES DURATION & SEVERITY" and "CONGESTION, COUGH, SNEEZING, SORE THROAT." (emphasis in original).

64.     The back panel packaging further claims that Cold Buster "shortens the duration and reduces the severity of symptoms associated with common colds and throat/sinus/bronchial

infections [including]: congestion, cough, headache, hoarseness, sore throat, sneezing/runny nose."

65.     The side panel reads: recover faster, "unlike many remedies that simply mask symptoms, Cold Buster speeds recovery.  The active ingredient in Cold Buster has been clinically shown to significantly reduce duration and severity of cold symptoms."

66.     The side panel further reads: "the active ingredient in Cold Buster is one of the most researched plant-based medicines available."

67.     The side panel further promises a powerful 3-way effect and claims that Cold Buster: attacks the cause of illness; speeds up movement of mucus out of the respiratory tract; and boosts the immune system.

68.     The Cold Buster packaging and product website claim that Cold Buster is homeopathic, but lists the product's only active ingredient as Pelagornium sidoides 1x, a non-homeopathic ingredient.  Cold Buster also lists capsaicin as an inactive ingredient.

    e.     *Headache Buster*

69.     The Buster Brands webpage for Headache Buster reads:

- "Fast: begins to provide relief in quickly."

- "Safe: enjoy worry free relief-as long as you need it.  Non-habit forming; free of harmful side effects; no known drug interactions."

- "Effective: A powerful pain-relieving sensation proven effective and praised by serious sufferers," with a link to the Proven Relief Page.

- "Natural: Unlike many headache medicines, Headache Buster does not contain acetaminophen or ibuprofen." and

- "Helps to relieve migraine headaches; cluster headaches."

15

70.    The Buster Brands webpage for Headache Buster lists the product's active ingredients as Capsicum 4x/5x (capsaicin), Pyrethrum parthenium 3x (feverfew), Mentholum 1x (peppermint), and Eucalyptus globulus 2x (eucalyptol).

71.    In a third variation of the product's ingredient list, the product packaging for Headache Buster, lists a 5X concentration of capsaicin, a 1X concentration of Mentholum, and lists Eucalyptus globulus as an active ingredient.

### Hi-Tech Acquires The Sinus Buster Products

72.    On March 7, 2012, Hi-Tech acquired from Dynova Industries, the Sinus Buster Products including Sinus Buster, Sinus Buster Mild, Cold Buster, Allergy Buster and Headache Buster.

73.    Hi-Tech continues to market and sell the Sinus Buster Products through its Health Care Products division using the same representations about the product that Dynova had previously made.  The only modification to the Buster Brands website after the acquisition was that the legend on the bottom of the webpage was changed from "© 2012 SiCap, LLC" to "© 2012 Health Care Products."

### False And Misleading Claims

### Sinus Buster Products Are Not Homeopathic

74.    Defendants falsely represent that the Sinus Buster Products are homeopathic.  The Sinus Buster Products are not and have never been homeopathic.

75.    Defendants' designation of the Sinus Buster Products as homeopathic is merely their attempt to circumvent the FDA approval process designed to prevent the distribution, marketing and sale of ineffective, unproven and potentially unsafe product.

16

76.     While other manufacturers of OTC drugs for the treatment of sinus, cold headache and allergy symptoms are required to prove the effectiveness of their products through the FDA's NDA process, Defendants will not and cannot do the same, because the Sinus Buster Products are ineffective and unproven.

77.     The FDA describes homeopathy as "[t]he practice of treating the syndromes and conditions which constitute disease with remedies that have produced similar syndromes and conditions in healthy subjects." The Sinus Buster Products do not satisfy this definition.

78.     In his book, *Working Class Entrepreneur*, Perry admits that he claimed the product was homeopathic to take advantage of what he described as "many gray areas in the FDA's rules." *Working Class Entrepreneur* at 60.

79.     The purported concentrations of ingredients in Sinus Buster and Sinus Buster Mild show that they are not homeopathic. According to homeopathic theory, a patient should have a stronger response to a more highly diluted solution, not a weaker one. The only difference between the purportedly homeopathic regular and mild products is that the regular version contains a higher concentration of Capsaicin (3x) than the mild version (5x). While these concentrations make sense from a conventional medicine standpoint (where a lower dosage is likely to be less potent), they fly in the face of any homeopathic standards (which is inconsistent with known scientific principles). If Sinus Buster was truly a homeopathic product it should be much less potent than Sinus Buster Mild because it contains a 100 times greater concentration of Capsaicin than Sinus Buster Mild.

80.     Moreover, the Sinus Buster Products do not contain the homeopathic concentrations of ingredients that their labels and marketing indicate and they are not manufactured according to homeopathic principles. Indeed, Defendants do not even consistently

17

list the concentrations of ingredients in the Sinus Buster Products and do not consistently list whether those ingredients are active or inactive.

81.     This Sinus Buster scam is nearly impossible for the average consumer to detect because most consumers are not familiar with the medicinal properties of Capsaicin, if any, and most consumers are not familiar with what Perry calls the "many gray areas" in the FDA regulations concerning homeopathic products. They would not even suspect that Defendants could get away with marketing an ineffective unapproved illegal drug merely by labeling it homeopathic.

### *The Sinus Buster Products Are Not Effective Or Clinically Proven To Be Effective*

82.     Defendants also claim that the efficacy of the homeopathic Sinus Buster Products is supported by independent clinical studies of the active ingredients in the products. But none of the independent clinical studies concerned homeopathic products, or homeopathic dilutions of the so- called active ingredients.

83.     There is only one purported clinical study concerning any of the Sinus Buster products or any purportedly homeopathic capsaicin product. Defendants falsely represent on their website and in their advertising that this study was a double-blind placebo controlled clinical trial.

84.     The study was funded by SiCap and conducted by the company's own medical advisor, Dr. Jonathon Bernstein. Based on the results of this study, SiCap's paid advisor claims that "Sinus Buster is a powerful solution for sinus congestion, pressure and headaches that not only provides immediate relief, but also provides sustained relief throughout the course of the two-week treatment period." However, the study was rigged from the start.

18

85.     The Dynova funded study was flawed because the members of the placebo group received an inert substance, while the experimental group received a shot of hot cayenne pepper up their nose. Therefore, it is likely that both the patients and the doctors knew who was in the experimental group and who was in the placebo group.

### The Sinus Buster Products Are Not FDA Approved

86.     Defendants have suggested that the Sinus Buster Products have been approved by the FDA and that its medical claims have been evaluated by the FDA, but neither of those statements is true.

87.     One article promoting the Sinus Buster Products reads: "According to SiCap Industries (the manufacturer), this new allergy formula is the first hot pepper nasal spray registered under the Nation Drug Code as an OTC (Over The Counter) medicine.  SiCap researchers spent two years developing an allergy version of their classic Sinus Buster hot pepper nasal spray, and *the FDA was quick to register the formula as an official Homeopathic OTC*." (Emphasis added).

88.     In the same article, Perry was quoted as saying: "We've created a brand new OTC category with our Sinus Buster pepper nasal spray line. ... It's really a first in Homeopathic technology and our research has only just begun.  Pretty soon we'll be introducing ... a special PMS formula *using FDA approved Homeopathic tinctures*." (Emphasis added).

89.     A press release issued by SiCap during the class period further suggests or states that the FDA has approved the Sinus Buster Products:

> A small natural health company has developed the world's first "FDA Registered" hot pepper nasal spray. **Under FDA guidelines, Sinus Buster (Capsaicin) pepper nasal spray has now become an accepted (OTC) over the counter medicine.** According to the manufacturer [sic], **this approval** represents

a breakthrough in natural medicine **allowing Sinus Buster to make specific medicinal claims** under NDC (National Drug Code) rules.

* * *

Each of these exclusive "All Natural" formulas are **registered with the FDA as official Homeopathic OTC (over-the-counter)** medications designed to relieve a variety of chronic health issues ....

Each of our Sinus Buster formulas use specific herbal extracts that **have been approved by the FDA** to treat certain conditions under the rules of the National Drug Code. (Emphasis added).

90.     Perry maintains a video on his youtube.com website where he makes the

following representations about the FDA's treatment of Sinus Buster products.

Today **we actually have registration numbers with the FDA** for all of our products, we actually created the first new category really, and it's the first line of capsaicin nasal sprays to be registered with the FDA. Literally within weeks I'm selling hundreds and hundreds a week.

*See* Youtube.com video located at http://www.youtube.com/watch?v=f5kz8FZ5h2c (1:34-

2:25) (last accessed May 11, 2012).

91.     Perry even penned an article on behalf of SiCap Industries titled: "*Is Sinus

Buster FDA Approved?*" In the article, Perry distorts the truth and implies that Sinus Buster

Products are FDA approved:

Each of [the Sinus Buster Products'] exclusive "All Natural" formulas are *registered with the FDA* as official Homeopathic OTC (over-the-counter) medications *designed to relieve a variety of chronic health issues*. ... Each of our *Sinus Buster formulas use specific herbal extracts that have been approved by the FDA to treat certain conditions* under the rules of the National Drug Code. (Emphasis added).

92.     In reality, Defendants' medicinal claims have not been approved or allowed by

the FDA. Sinus Buster Products are not approved by the FDA, nor has the labeling of the Sinus

Buster Products been approved by the FDA. The FDA has taken no favorable action with respect to Dynova's registration of the Sinus Buster Products' labels.

## Defendants' False And Misleading Claims Are Material

93.     All of Defendants' false and/or misleading claims challenged herein relate to matters that are material and important to a consumer's purchasing decision, as they concern the effectiveness of the Sinus Buster Products, the qualities of those products and the reason for which they are sold.

94.     Defendants' marketing and packaging materials intended to, and did, induce Plaintiff and members of the Class to rely upon the representations that Sinus Buster Products were effective for their intended use. Those representations were a substantial factor in causing Plaintiff and members of the Class to purchase Sinus Buster Products instead of conventional medication that had been tested and proven effective according to FDA standards.

95.     At the time members of the Class purchased Sinus Buster Products, they were unaware of the fact that the Sinus Buster Products: (1) are not proven effective for their intended use; (2) are not effective for their intended use; (3) are not lawful for sale in the United States, (4) are not FDA approved; and (5) are sold as homeopathic products, in order to circumvent FDA regulations and oversight, including its requirement that Defendants prove the efficacy of those products.

96.     It was a violation of state and federal law for Defendants to sell Sinus Buster Products in a false, misleading, deceptive and/or unconscionable manner.

97.     If members of the Class had been aware of the true facts concerning the Sinus Buster Products, they would not have purchased the products. Such facts include the following: (1) Sinus Buster Products are not proven effective for their intended use; (2) they are not

21

effective for their intended use; (3) they are not lawful for sale in the United States, (4) they are

not FDA approved; and (5) Defendants devised and/or implemented a scheme to falsely claim

that the Sinus Buster Products are homeopathic, in order to circumvent FDA regulations and

oversight and the FDA's requirement that Defendants prove the efficacy of those products.

98.     Plaintiff and members of the Class have been injured in fact and have suffered an

ascertainable, out of pocket loss.  Plaintiff and members of the Class therefore seek a refund

and/or rescission of the transaction and all further equitable and injunctive relief as provided by

applicable law.

**CLASS ACTION ALLEGATIONS**

99.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure

23 on behalf of a Class consisting of all persons in the United States who, within the relevant

statute of limitations period, purchased Sinus Buster Products (the "Class").

100.    Plaintiff also seeks to represent a subclass of all Class members who purchased

Sinus Buster Products in the State of Minnesota (the "Subclass" or "Minnesota Subclass").

101.    Plaintiff reserves the right to amend or modify the Class and Subclass definition

with greater specificity or further division into subclasses or limitation to particular issues as

discovery and the orders of this Court warrant.

102.    Excluded from the Class and Subclass are Defendants, the officers and directors

of Defendants at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a

controlling interest.

103.    The Court can define the Class and Subclass and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

104.    Plaintiff is a member of the Class and Subclass he seeks to represent.

105.    The Class and Subclass are so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Class or Subclass, Defendants claim that Sinus Buster Products can "be found nationally at most major food, drug, and mass retailers." Upon information and belief and based upon Defendants' press releases and public statements, the Class and Subclass include hundreds of thousands of members. Accordingly, joinder is impracticable.

106.    There are numerous questions of law and fact common to the Class and Subclass which predominate over any individual actions or issues, including but not limited to:

        a.      Whether Defendants violated the Magnuson-Moss Act, 15 U.S.C. § 201,*et seq.*;

        b.      Whether Defendants breached any implied warranties made to Plaintiff, the Class and the Subclass;

        c.      Whether Defendants breached an implied warranty of fitness and merchantability made to Plaintiff, the Class and the Subclass;

        d.      Whether Defendants were unjustly enriched by their conduct;

        e.      Whether Defendants' marketing of Sinus Buster Products is false, misleading, and/or deceptive, and whether practices are unjust, unreasonable or unlawful;

        f.      Whether Defendants falsely or misleadingly represented that the Sinus Buster Products are FDA approved;

23

g.     Whether the Sinus Buster Products are effective or proven effective;

h.     Whether the sale of the Sinus Buster Products in the United States is illegal;

i.     Whether the Sinus Buster Products are homeopathic;

j.     Whether Class and Subclass members suffered an ascertainable loss as a result of Defendants' misrepresentations; and

k.     Whether, as a result of Defendants' misconduct as alleged herein, Plaintiff, the Class and Subclass members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

107.    Plaintiff's claims are typical of the claims of the Class and Subclass in that Plaintiff and the members of the Class and Subclass were exposed to Defendants' false, misleading, and deceptive marketing and promotional materials of the Sinus Buster Products and were subject to Defendants' unjust, unreasonable and unlawful practices.

108.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Subclass and common issues predominate.

109.    Plaintiff has retained counsel competent and experienced in complex class actions.

110.    Notice of this class action can be provided to Class and Subclass members by techniques and forms similar to those customarily used in other class actions, such as by published notice, or Internet notice, or first-class mail or a combination thereof, or other means deemed suitable.

111.    Class certification is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class and Subclass, making class-wide relief appropriate.

24

In addition, the prosecution of separate actions by individual members of the Class and Subclass would create a risk of incompatible standards of conduct for Defendants and inconsistent or varying adjudications for all parties.

112. A class action is also superior to other available methods for the fair and efficient adjudication of this action. As the damages suffered by the individual members of the Class and Subclass may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclass to individually redress the wrongs done to them.

## COUNT I
## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)

113. Plaintiff and Class and Subclass members reallege and incorporate by reference each allegation set forth above and further allege as follows.

114. Plaintiff brings this Count I individually and on behalf of the members of the Class and Subclass against Defendants.

115. The Sinus Buster Products are consumer products as defined in 15 U.S.C. §2301(1).

116. The Sinus Buster Products are sold at retail for more than five dollars.

117. Plaintiff and Class and Subclass members are consumers as defined in 15 U.S.C. § 2301(3).

118. 207. Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

119. In connection with the sale of the Sinus Buster Products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that Sinus Buster Products

were effective for their intended use, proven effective for their intended use, homeopathic, and FDA approved.

120.    In connection with the sale of the Sinus Buster Products, Defendants made implied warranties including the warranties that the product was legal for sale in the United States and FDA approved.

121.    Defendants breached these warranties because the Sinus Buster Products were not effective for their intended use, proven effective for their intended use, homeopathic, FDA approved or legal for sale in the United States.

122.    Plaintiff provided notice of Defendants' breach of warranties prior to filing suit.

123.    By reason of Defendants' breach of the express written and implied warranties, Defendants violated the statutory rights owed to Plaintiff and Class and Subclass members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiff and Class and Subclass members.

## COUNT II
## UNJUST ENRICHMENT

124.    Plaintiff and Class and Subclass members incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

125.    Plaintiff brings this Count II individually and on behalf of the members of the Class and Subclass against Defendants.

126.    Plaintiff and Class and Subclass members conferred a benefit on Defendants by purchasing the Sinus Buster Products.

127.    Defendants have been unjustly enriched in retaining the revenues derived from Class members' purchases of the Sinus Buster Products, which retention under these

26

circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the legality, efficacy and nature of the product and caused Plaintiff and the Class and Subclass to lose money as a result thereof.

128.    Plaintiff and Class and Subclass members suffered a loss of money as a result of Defendants' unjust enrichment because: (a) they would not have purchased the Sinus Buster Products if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

129.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class and Subclass members is unjust and inequitable, Defendants must pay restitution for their unjust enrichment, as ordered by the Court.

## COUNT III
## COMMON LAW FRAUD

130.    Plaintiff and Class and Subclass members reallege and incorporate by reference each allegation set forth above and further allege as follows.

131.    Plaintiff brings this Count III individually and on behalf of the members of the Class and Subclass against Defendants.

132.    Defendants made false representations about the Sinus Buster Products, including representations on the product packaging that the Sinus Buster Products provided effective relief from cold and sinus symptoms. This statement was material because it is the only reason a consumer would purchase the Sinus Buster Products.

27

133.    Defendants also falsely and misleadingly represent in the advertising and promotion of the Sinus Buster Products, including on the product packaging, that those products were homeopathic.

134.    Plaintiff and the Class and Subclass members were exposed to these false and misleading statements on the product packaging at the time immediately prior to their purchase of the Sinus Buster Products.

135.    Defendants also misleadingly represented in the advertising and promotion of the Sinus Buster Products, that the products were FDA approved.

136.    Defendants made these statements with the intent to deceive Plaintiff and the Class and Subclass members and induce them to purchase the Sinus Buster Products.

137.    Plaintiff and the Class and Subclass members reasonably relied upon Defendants' false and misleading representations in making their purchases. They had no way of knowing that Defendants' statements were false and misleading.

138.    As a result of their purchase, Plaintiff and the Class and Subclass members suffered damages in the amount of the purchase price of the Sinus Buster Products.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

139.    Plaintiff and Class and Subclass members reallege and incorporate by reference each allegation set forth above and further allege as follows.

140.    Plaintiff brings this Count IV individually and on behalf of the members of the Class and Subclass against Defendants.

28

141.     Defendants, as manufacturers, marketers, distributors, or sellers, expressly warranted that the Sinus Buster Products were effective, FDA approved, proven effective, and homeopathic.

142.     In fact: (i) Sinus Buster Products are not effective for their intended use; (ii) the FDA has never approved the Sinus Buster Products and the products have not been evaluated by the FDA for safety or efficacy; (iii) the Sinus Buster Products have never been proven effective; and (iv) the products are not homeopathic.

143.     Plaintiff and Class and Subclass members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the Sinus Buster Products on the same terms if they had known the true facts regarding the effectiveness and contents of the products; (b) they paid a price premium due to the mislabeling of Sinus Buster Products; and (c) the Sinus Buster Products do not have the quality, effectiveness or value that Defendants promised.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

144.     Plaintiff and Class and Subclass members repeat and reallege each and every allegation above, as if set forth in full herein.

145.     Plaintiff brings this Count V individually and on behalf of the members of the Class and Subclass against Defendants.

146.     Defendants impliedly warranted that the Sinus Buster Products were FDA approved and/or legal for sale in the United States. Defendants did so with the intent to induce Plaintiff and members of the Class and Subclass to purchase those products.

29

147.    Defendants breached their implied warranties in that the Sinus Buster Products are not FDA approved and are not lawfully sold in the United States.

148.    Had Plaintiff and the members of the Class and Subclass known the true facts, they would not have purchased the Sinus Buster Products.

## COUNT VI
## VIOLATION OF MINN. STAT. § 8.31, *et seq.*

149.    Plaintiff and Subclass members repeat and reallege each and every allegation above, as if set forth in full herein.

150.    Plaintiff brings this Count VI individually and on behalf of the members of the Subclass against Defendants.

151.    Defendants engaged in misrepresentations, unlawful schemes and courses of conduct intended to induce Plaintiff and Subclass members to purchase Sinus Buster Products in violation of Minnesota's laws prohibiting consumer fraud (i.e., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69 (2010)), unlawful and deceptive trade practices (i.e., the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.09 (2010), and the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44 (2010)), and false advertising (i.e., Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67 (2010)).

152.    Defendants' misrepresentations, unlawful schemes and courses of conduct with regard to the Sinus Buster Products were broadcast to the general public and created widespread harm to consumers by exposing the public to fraud and deceit and by influencing their purchasing decisions with adverse effect concerning the health conditions that Sinus Buster Products falsely purported to treat.  Moreover, they resulted in unfair competition in the market

30

for Defendants' competitors who otherwise maintained the integrity of the market by faithfully following legal and ethical norms regarding consumer protection issues.

153. As a result of these misrepresentations and unlawful schemes, Defendants received ill-gotten gains from the revenue and profits they received from the sale of Sinus Buster Products to Plaintiff and Subclass members in the amount of the retail purchase price of same.

154. Wherefore, Plaintiff and Subclass members seek to permanently enjoin Defendants from continuing to engage in the misleading, deceptive and unlawful practices described herein, and to demand that Defendants make full restitution for all monies received as a result of same, including all ill-gotten revenues or profits.

## COUNT VII
### (Violation of the Consumer Fraud Laws of the Various States)

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

156. Plaintiff brings this Count VII individually and on behalf of the members of the nationwide Class against Defendants.

157. By falsely and misleadingly indicating that the Sinus Buster Products were effective, proven effective, homeopathic and lawfully sold in the United States, when in fact they are not, Defendants have engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

158. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, *et seq.*

159. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, *et seq.*

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*

161.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, *et seq.*

162.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, *et seq.*; false advertising in violation of CAL. BUS. & PROF. CODE § 17500, *et seq.,* and violations of the Consumers' Legal Remedies Act, CAL. CIV. CODE § 1780, *et seq.* (for injunctive relief only).

163.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, *et seq.*

164.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

166.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, *et seq.*

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

169.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1, *et seq.*

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*

173.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE §714.16, *et seq.*

174.    Defendants have engaged in unfair competition or unfair deceptive acts or practices in violation of N.J.S.A. § 56:8-1, *et seq.*

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, *et seq.*

176.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*

177.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, *et seq.*

178.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

179.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, *et seq.*

180.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, *et seq.*

33

181.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, *et seq.*

182.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, *et seq.*

183.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*

184.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, *et seq.*

185.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*

186.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, *et seq.*

187.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

188.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*

189.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

190.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J.S.A. 56:8-1, *et seq.*

191.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

34

192.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*

193.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. §1345.01, *et seq.* and Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*

194.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

195.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

196.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, *et seq.*

197.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

198.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, *et seq.*

199.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

200.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, *et seq.*

201.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

202.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, *et seq.*

203.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

204.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

205.   Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*

206.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, *et seq.*

207.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

208.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*

209.   The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions, and each of these statutes also prohibits the sale of products which are prohibited by law.  Defendants violated each of these statutes by making illegal sales, and also by making false and misleading statements indicating

36

that the Sinus Buster Products were: (i) effective; (ii) proven effective; (iii) FDA approved; (iv) homeopathic; and (v) lawfully sold in the United States.

210.    Plaintiff and Class members suffered a loss of money as a result of Defendants' fraudulent concealment and nondisclosure because: (a) they would not have purchased the Sinus Buster Products on the same terms if the true facts had been known; and (b) the Sinus Buster Products did not perform as promised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.    Determining that this action is a proper class action;

B.    Awarding compensatory damages in favor of Plaintiff and members the Class and Subclass against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding injunctive relief against Defendants to prevent Defendants from continuing their ongoing unfair, unconscionable and/or deceptive acts and practices;

D.    Awarding Plaintiff and members of the Class and Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: June 8, 2012.                     Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
         Joseph I. Marchese
Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: 212-989-9113
Fax: 212-989-9163
E-Mail:  scott@bursor.com
              jmarchese@bursor.com

38